[No. 2917.]

## J. D. WOMACK *v.* THE STATE.

1. EVIDENCE—CONFESSIONS.—It is provided by the statute, Article 749 of the Code of Criminal Procedure, that "the confession of a defendant may used in evidence against him if it appear that the same was freely made, without compulsion or persuasion, under the rules hereafter prescribed." The defendant in this case being neither in confinement nor under arrest when he made the confession, none of the rules prescribed by the succeeding Article apply in this case, and the admissibility of the confession depends on the common law.

2. SAME.—In the absence of statutory provisions regulating confessions, other than such as are made when the defendant is in confinement or custody, the common law rule on the subject controls. That rule is as follows: "The confession (to be admissible in evidence) must be voluntary, not obtained by improper influence, nor drawn from the prisoner by means of threat or promise; for, however slight the threat or promise may have been, a confession so obtained cannot be received in evidence, on account of the uncertainty and doubt whether it was not made rather from a motive of fear, or of interest, than from a sense of guilt." The essence of the rule is that, to qualify the confession as evidence, it must

have been voluntarily made, without the appliances of hope or fear by any other person.

2. SAME—CASE STATED.—The prosecuting witness was permitted, over the defendant's objections, to testify that he told the defendant that he had consulted with the prosecuting attorney, and was authorized to say to the defendant that if he would turn State's evidence and testify against his co-defendant he would not be prosecuted, and that he, the witness, in his own behalf, promised the defendant that he would make no complaint against him if he would turn State's evidence and testify. Under these circumstances the purported confession was testified to have been made to the prosecuting witness by the defendant, and the prosecuting witness was permitted, over defendant's objection, to repeat the confession to the jury. The trial judge explained that his reason for admitting the confession was that, after having made the agreement to turn State's evidence and testify, the defendant not only repudiated the agreement and refused to testify, but denied having told the prosecuting witness anything. *Held,* that the court erred in admitting the confession; that the subsequent repudiation of the confession by defendant can in no way affect the circumstances under which it was made, and the true question was whether or not the defendant was improperly induced, by hope or fear, to make the confession to the prosecuting witness. If so, no subsequent act of bad faith on the part of the defendant could render valid that which *per se* was illegal as a voluntary confession. See the opinion on the subject.

4. THEFT—EVIDENCE—FACT CASE.—See statement of the case for evidence, in a theft case, *held* insufficient to establish the complicity of the accused in the taking.

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The indictment in this case was joint against the appellant and one E. M. Fuller, and charged them with the theft of six hogs of the aggregate value of twenty-seven dollars, the property of John B. Henderson, in the county of Erath, Texas, on thirtieth day of September, 1881. The appellant, being alone upon trial, was convicted, and his punishment was affixed at a term of one month in the county jail and a fine of one hundred dollars.

W. H. Trent was the first witness for the State. He testified that he knew the defendant, and also E. M. Fuller, who was indicted with him in this case. He identified the defendant on trial as J. D. Womack. In the summer of 1881 witness contracted with E. M. Fuller for the purchase of four hundred head of hogs. In accordance with this contract, Fuller, on the fourth day of October, 1881, delivered to the witness a car load of hogs numbering one hundred and forty-one head. These hogs the

witness sold and delivered to A. Wheeler, of Waco, Texas. These were the only hogs witness ever sold to Wheeler. They were delivered to Wheeler at Waco. Witness did not make the contract with the defendant. The witness did not know, and had never seen the defendant until after the hogs were delivered.

The next witness for the State was A. Wheeler. He testified that he knew the witness Trent who had just testified. He made a contract with Trent in the summer of 1881, for the purchase of hogs. In pursuance of that contract, Trent delivered to the witness a car load of one hundred and forty-one hogs, in Waco, Texas, on the fifth day of October, 1881. These were the only hogs ever delivered to the witness by Trent. Witness turned these hogs into a pen with about four hundred other hogs which he had purchased from several different parties. Witness knew J. B. and J. P. Henderson, the gentlemen who were present as witnesses in this case. Some two or three weeks after Trent delivered these hogs to witness, J. B. Henderson came to the pens of the witness in Waco, looking for hogs which he said had been stolen from him. He found four head in the witness's pen which he claimed. One was a white and black spotted sow, two were shoats, and the fourth was a black barrow with white feet. The hogs claimed by J. B. Henderson were marked with a swallowfork and underbit in each ear, and were a portion of the number delivered to witness by Trent.

The two shoats would, in the judgment of witness, have weighed about eighty pounds each, the sow would have weighed about one hundred and twenty, and the black barrow about one hundred and ten pounds. The barrow's ears looked as though they had been dog bitten and afterwards infested by worms, but the mark described was plainly discernable. In addition to this pen, the witness had what he termed his "invalid pen." Henderson did not go through the invalid pen, as witness told him he had put none of the hogs purchased of Trent in that pen. Some of the hogs purchased by witness from Trent died before the arrival of Henderson.

Within a week after the visit of J. B. Henderson to the witness's pens, J. P. Henderson, a son of J. B. Henderson, came to the pens, examined the hogs, identified and claimed the same hogs that were claimed by J. B. Henderson. J. P. Henderson found also in the invalid pen another sow in the same mark as the four described, which he claimed for his father. The two

Hendersons claimed to know each of the hogs by their flesh marks. Witness paid Henderson fifteen dollars for the hogs, which, in the opinion of the witness, was their full value. None of the hogs were caught and examined at the time of young Henderson's visit, in the presence of the witness. The hogs were mast fed or range raised hogs, sometimes called "razorbacks."

J. B. Henderson was the next witness for the State. He testified that he knew the defendant Womack, the man Fuller, and the witness Wheeler. In September, 1881, the witness owned a bunch of forty head of hogs, running at what is known as McDow's hollow, in Erath county, Texas, from which the witness lived three miles distant. The witness last saw the hogs which the defendant is accused of stealing, about the last of August or the first of September of the year 1881. On his return home from court about the tenth of October, 1881, the witness missed eight head of hogs from his bunch. Two of the missing animals were shoats, and six were large hogs. They were all marked with a swallowfork and underbit in each ear. They were mast fed or range raised animals. One of them was a black barrow with white feet.

The witness made careful and unsuccessful search for the missing hogs through the range, and then, taking Mr. Norton with him, went to see the defendant about them. At that time the witness had no acquaintance with the defendant, and had no recollection of having seen him before. When witness and Norton rode up to defendant's house, the defendant met them at the fence. Witness told him where a bunch of his and Fuller's hogs were. Defendant replied that he was grateful for the information. Witness then asked him if he and Fuller were partners, and he said that they were. Witness asked him if he knew his, witness's, hogs. He replied that he knew the bunch of hogs on McDow's hollow, reputed to be witness's property. Witness then asked him if he knew his, witness's, mark. He said that he knew the mark that was said to be that of the witness, which was a swallowfork and underbit in each ear. Witness then asked him if he and Fuller owned or claimed any hogs in that mark. He replied that they did not; that they had owned some in that mark, but that they had run off the preceding spring, and gone back to Eastland county, whence they came; that they had heard of one of them on Armstrong creek, but of none of the others. Witness then asked him if he and Fuller, or either

of them, had used or shipped any of his hogs. Defendant replied in the negative. Witness then asked if they had shipped or used any hogs marked with a swallowfork and underbit in each ear, and he replied that they had not.

. A few days after this conversation with the defendant, the witness went to Waco and examined the hogs in A. Wheeler's pens. He found four of his hogs in Wheeler's pens. He knew the four animals both by their ear and flesh marks. One was a spotted sow, two were shoats, and the remaining one was a black barrow with white feet. The barrow's ears were injured—had been evidently bitten by dogs, and afterward infested by worms. The sow and shoats, when found by witness, were together in a part of the pen remote from that part of the pen where the barrow was found. The witness had been in the habit of seeing his hogs on the range, sometimes once, and sometimes three times a week, and, again, he would not see them for two or three weeks. Witness claimed the hogs when he found them in Wheeler's pens, and Wheeler gave him a written instrument, agreeing to hold the hogs subject to such judicial proceedings as witness might institute for their recovery. Wheeler had a second pen on his premises, which he called his "invalid pen." The witness did not examine the hogs in that pen. Witness, a few days after his return home, sent his son, J. P. Henderson, to look at the hogs in Wheeler's pen.

The witness again went to see the defendant, and found him in Dublin. He told the defendant that he wanted to have a talk with him, and suggested that each should select a friend to hear the conversation. To this proposition the defendant agreed, and selected a Mr. Carlysle. Witness selected Mr. Calvin Martin. The four parties stepped off from the public thoroughfare and sat down. Witness then said to defendant: "Mr. Womack, I am not satisfied about my hogs, and I want some further talk with you about them." The defendant replied: "All right." Witness then said: "I want you to tell these gentlemen what you told Mr. Norton and me." The defendant replied that he had forgotten what he told Norton and the witness. "Then," said the witness, "let me tell it over, and you say whether or not I tell it correctly." To this proposition the defendant agreed, and witness asked: "Didn't you tell me that you knew my hogs that run on McDow's hollow?" Defendant replied that he did, and witness asked: "Didn't you tell me that you knew my hog mark, and that it was a swallowfork and

underbit in each ear?" Defendant admitted that he did, and witness asked: "Didn't you tell me that you and Fuller did not claim any hogs in that mark; that you had had some, but that they ran away from you, and went back to Eastland county, and that you had only heard of one old sow since, and that she was on Armstrong creek." Defendant replied that he did, and witness asked him: "Didn't you tell me that you and Fuller had not shipped any of my hogs, or any hogs in my mark?" The defendant replied that he did, and witness said: "Well, Mr. Womack, I have been to Waco and found my hogs. That won't do. Now, your neighbors tell me that you have stood well until you got into this thing with Fuller, and I believe you have been led into it. I have been to town and seen the district attorney, and he tells me that if you will come out and tell the thing just as it occurred, and be a witness for the State against Fuller, he will not prosecute you, and will dismiss the case against you, if you should be indicted." The defendant studied awhile, and replied: "I will do it."

Proceeding to repeat the defendant's confession, the witness said: "Womack then said to me: 'We got six of your hogs, and shipped them to Waco. I had been over to meet the pay train on Sunday morning, and when I returned Fuller had six of your hogs in the pen. I told him he had better be careful about handling his neighbors' hogs, and he replied that the hogs belonged to him, and that he would do as he pleased with them. We took the hogs from the pen and put them in my field. The next morning we drove them up to Mount Airy and shipped them.'"

The witness promised the defendant not to prosecute him if he would testify for the State against Fuller. After the indictment in this case was presented, the witness and the district attorney went to the defendant and asked him to state what his testimony would be. The defendant denied then that he had made any statement to the witness concerning the theft of the hogs; said that he remembered nothing he had said to witness about the matter, and refused absolutely to testify for the State against Fuller. The defense objected and excepted to the admission of the evidence of this witness about the confession.

The stolen animals belonged to the witness, and were taken in September, 1881, without the knowledge or consent of the witness. The two shoats were worth three dollars each, and the six larger hogs were worth six dollars each. Before the witness's

conversation with the defendant in Dublin, in which he, defendant, agreed to turn State's evidence, the witness had seen the district attorney and obtained his consent to the propositions to defendant to turn State's evidence. In making the propositions, the witness acted under the directions and advice of the district attorney. Witness proposed, on his own responsibility, not to include the defendant in the complaint he intended making, if he would turn State's evidence. He, however, told the defendant that the grand jury would most probably include him in the indictment, but, in that event, the district attorney would dismiss the case as to him. if he would testify fully for the State against Fuller. After this conversation, witness went to Stephensville and filed a complaint against Fuller, but not against the defendant.

J. P. Henderson was the next witness for the State. He testified that he was the son of the witness J. B. Henderson. He remembered his father's loss of some hogs late in September, 1881. His father went to Waco in October, and a few days after his return the witness went to that city to examine some hogs in Wheeler's pens. In one pen he found one sow, two shoats, and a black barrow with white feet, which he knew by the flesh and ear marks to belong to his father. He found another of his father's sows in another pen, which Wheeler called his invalid pen. All of the five hogs bore the swallowfork and underbit mark in each ear, which was the hog mark of J. B. Henderson. Witness had often seen the hogs on the range. When the witness saw the black barrow in Wheeler's pen, one of his ears had been injured, and had been attacked by worms; so much so that the witness could not identify the mark until he caught the hog and examined it. He did not positively know whether or not Wheeler was present when he caught the hog, but thought he was. At all events one of his hands was present and helped witness catch the hog.

S. L. Norton was the next witness for the State. He testified that some time in October, 1881, Colonel Henderson asked him to go with him to see the defendant, and he did so. When they reached the fence Colonel Henderson called the defendant, who came out to the fence. Colonel Henderson introduced himself, and the defendant replied to Henderson that he knew him. The witness then gave substantially the same account of what transpired, and what was said by Henderson and defendant at the fence, as was given by Henderson, except that he did no

member hearing defendant say that he and Fuller were part-
ners. The witness had discussed the matter with Colonel Hen-
derson as late as the day before this trial. Henderson reminded
him of some parts of the conversation which he had forgotten,
but which, his mind being refreshed, he remembered distinctly.

Calvin Martin was the next witness for the State. He testi-
fied that he and a Mr. Carlysle were present at a conversation
between the defendant and J. B. Henderson, in the town of
Dublin, some time in October, 1881. This witness repeated the
conversation in detail substantially as it was related by the wit-
ness J. B. Henderson. The witness stated in conclusion that he
had not talked over his testimony with Henderson. At this
point the State closed.

Mr. Carlysle, the first witness for the defense, gave a different
version of the conversation between Henderson and defendant
in the presence of himself, the witness, and Martin. Henderson
said to defendant: "I have been to Waco, and found four or
five of my hogs that you and Fuller drove. Now, if you will
come out and tell the truth, and help prosecute Fuller, you shall
not be hurt. I have talked with Bell, the district attorney, and
he says that if you will come out with the truth and help prose-
cute Fuller you shall not be hurt. Now, Womack, do you know
my mark?" The defendant replied: "Yes, I know a mark said
to be yours." Henderson then asked: "Did you and Fuller
drive any hogs in that mark?" Defendant replied that he and
Fuller drove five or six head in that mark. Henderson asked:
"Where did you get them?" Defendant replied: "The first I
saw of them they were in the pen at old uncle Daniel Fuller's.
I had to go to the wood yard to meet the pay train, and when I
got back to old man Fuller's the hogs were in the pen." Hen-
derson asked: "Who penned them?" Defendant replied: "Un-
cle Daniel and E. M. Fuller." Henderson then asked him: "Did
you not tell me the other day that you did not drive any hogs
marked with a swallowfork and underbit in each ear?" Defend-
ant replied: "I said that I did not remember driving any in that
mark; that I did not have the list of marks with me. I told
Fuller that he ought to be careful about driving hogs in marks
given in the county; that he might get his foot into it; and that
Fuller said that they were his hogs, that he had the marks re-
corded and would do with them as he pleased." Henderson
then said: "Yes, he has my mark, and five or six others given
in the county, recorded. Is that all you know about it?" De-

fendant said: "Yes." Henderson replied: "Well, Womack, I will pledge you my word as a man, a neighbor and a Mason, that you shall not be hurt. I will go right to town and have Fuller arrested." Henderson then left, thanking witness and Martin. Witness heard every word of that conversation. Defendant did not tell Henderson that he and Fuller were partners. He said nothing about a dog catching the barrow and injuring his ears as he was driven into the pen.

Mrs. E. M. Fuller, the wife of the party jointly indicted with this defendant, testified that, in January, 1881, E. M. Fuller brought home a small bunch of hogs that included a spotted sow, a black barrow and four small shoats. Witness knew nothing about their ages. She knew nothing about marks, but knew that these animals were said to be marked with a swallow-fork and underbit in each ear. The black barrow had some white feet; witness did not know how many. One of his ears was a little crimped, by a dog catching him. These hogs were quite gentle, and ran at and about Fuller's place from January until he drove them off in September, 1881. Witness had not seen them since. She frequently fed them a little corn to keep them gentle, before they were driven off. E. M. Fuller and his father, Daniel Fuller, drove these hogs to Daniel Fuller's house about the first of October, since when witness has not seen them.

Wash. Hammett testified, for the defense, that he lived on E. M. Fuller's place in the year 1881, and was at his house in January of that year. Fuller, at that time, asked witness to look at some hogs he had just brought home. Among them was a two-year-old spotted sow, a black barrow with some white feet, about eighteen months or two years old, and four spotted shoats about six months old. These six hogs were all marked with a swallowfork and underbit in each ear. Witness saw these hogs almost every day after that, until they were driven off by Fuller, about the first of October, 1881. Some time in July, or August, a dog caught the black barrow, and so injured his ear that it crimped considerable, but not enough to disfigure the mark. All of the hogs described were gentle. Witness had frequently seen Fuller and his wife feed them. Fuller claimed them and said that he bought them from William Payne, of Eastland county. Witness had not seen those hogs since Fuller drove them off in October, 1881. He had heard Fuller say that he had the defendant hired. George Johnson's testimony, for

the defense, was, in substance, the same as that of the witness Hammett.

Mat. Tucker testified, for the defense, that Fuller penned some hogs at his, witness's, house in September, 1881. The defendant was then with him, and seemed to receive his directions from Fuller, and obey them. Fuller told the witness that defendant was hired to him.

M. E. McLaren testified that about the first of October, 1881, he went with Holcomb to the hog pens of A. Wheeler, near Waco. Holcomb had a list of marks on a piece of paper. They found four hogs in the pen which Holcomb said belonged to J. P. Henderson. Three were spotted hogs and one was a black barrow. They were small, inferior hogs, in reasonably good order.

Holcomb testified, for the defense, that he found none of the other hogs for which he was hunting in Wheeler's pens, except the four that belonged to Henderson.

Moses Hurley, Mat. Tucker, Carlysle, county surveyor Lowe, land agent Hymen, sheriff Slaughter and State's witness Calvin Martin qualified themselves, and testified that the defendant's reputation for honesty was good.

The motion for new trial denounced the verdict as contrary to the law, the evidence and the charge of the court.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Our statute provides that "the confession of a defendant may be used in evidence against him if it appear that the same was freely made, without compulsion or persuasion, under the rules hereafter prescribed." (Code Crim. Proc., Art. 749.) None of the rules prescribed by statute are applicable to the question raised by the bill of exceptions in this record, because the appellant, at the time of making the confession, was neither in confinement or under arrest. If it be admitted that our Code makes provision only for such confessions as are made when the defendant is in jail or other place of confinement, or whilst in custody of an officer (Code Crim. Proc., Art. 750), then, in the absence of a statutory rule, we would be relegated to the common law for a rule which would govern. (Code Crim. Proc., Art. 725.)

At common law, the rule was that "the confession must be voluntary; not obtained by improper influence, nor drawn from the prisoner by means of a threat or promise; for, however slight the threat or promise may have been, a confession so obtained cannot be received in evidence, on account of the uncertainty and doubt whether it was not made rather from a motive of fear or interest than from a sense of guilt." (Phil. Ev., 86; *Warren* v. *The State*, 29 Texas, 369.) "The material inquiry, therefore," says Mr. Greenleaf, "is whether the confession has been obtained by the influence of hope or fear, applied by a third person to the mind of the prisoner. * * * The rule of law, applicable in all cases, only demands that the confession shall have been voluntarily made, without the appliances of hope or fear by any other person." (1 Greenl. Ev., 13 ed., sec. 219; Whart. Crim. Ev., 8 ed., secs. 650, 651. See, also, Roscoe's Crim. Ev., 17 ed., p. 40, *et seq.*, and note.)

As shown by the bill of exceptions in this case, the purported confession of defendant was made under the following circumstances: The prosecutor, Henderson, told defendant that he, Henderson, had consulted with the district attorney, and that officer had authorized him to say to defendant that if he would turn State's evidence against his co-defendant, Fuller, he, defendant, would not be prosecuted for the theft of the hogs. Henderson also promised defendant that he, Henderson, would not file any complaint against him if defendant would appear and testify against Fuller. Under these promises, the purported confession, which the court admitted, over objection of defendant, to be given in evidence, was made to the prosecutor, Henderson. As a reason for admitting this evidence, the learned judge, in his explanation to the bill of exceptions, states, in substance, that, after the agreement with the district attorney and Henderson, the defendant repudiated the agreement, and not only refused to testify against Fuller, but also denied having told Henderson anything.

That defendant subsequently repudiated the agreement, does not, and cannot, affect the question as to the circumstances under which the confession was made. At the time it was made, was he not induced to make it through the promise or hope held out to him by Henderson? If so, then no subsequent act of bad faith on his part could or would render valid and legal that which *per se* was illegal and inadmissible as a voluntary confession. We are clearly of the opinion that the court erred in ad-

mitting the confession over the objections of defendant, as shown by the bill of exceptions. There is no similarity, or, rather, identity, between judicial and extra-judicial confessions with regard to the rule invoked by the learned judge in his explanation. Had the confession been a judicial one, or one made under such circumstances as those provided for in Article 750 of the Code of Procedure, and the defendant had subsequently repudiated his agreement to testify against his co-defendant, the fact that he had been previously cautioned that his evidence would be used against him if he failed so to testify would doubtless have rendered the confession admissible as evidence against *him* when tried for the offense. But, when not under arrest or in custody, or in any of the conditions pointed out in Article 750, to make the confession of a party admissible, it must have been voluntary, that is, one not induced by any promise creating hope of benefit or immunity, or any threats creating fear of punishment. (*Warren* v. *The State,* 29 Texas, 369.)

In addition to this error committed by the court in the admission of the confession of defendant, we are of the opinion, even taking the confession to have been properly admitted, and as part of the evidence, that the testimony is not sufficient to establish the guilty complicity of defendant in *the taking or theft* of the hogs, however much it may show his conduct and subsequent connection with the stolen property to be reprehensible in morals and law.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered May 17, 1884.